Brown. May it please the Court. My name is Andrew Freifeld. I represent Josnel Rodriguez on this appeal. The shooter learned where his victim was. He went and he got a gun, and he came back to the scene, and he killed his victim. Could you please speak? We're going to take just a second. Mr. Freifeld, raise the podium a little bit, I think, which is the button over – no, right on top. That'll get the mic a little closer to your mouth. Shall I repeat it? Why don't you? That would be good. Thank you. And we'll start you over with your time. Thank you. The killer learned where his victim was. He went and he got a gun, and he returned to the scene, and he killed his victim. What does that have to do with my client is a question that is presented here. All my client did was he was waiting for his ride. The two of them had been together earlier in the evening. He waited for his ride. The guy got back, and he said, I'm going to shoot this guy. And he said, okay, I'm going to go wait in the car for you. Lopez testified that your client told Rodriguez where Davis was precisely, right? Yes. He was about to come out. Okay. He knew where Davis was when he arrived there. Well, he knew he was at a party that had 100 people, but he didn't know that he was about to come out, and he didn't know precisely where he was or whether he was still there, right? I dispute that because the security guard who testified was right outside. He witnessed the crime. He said the party was breaking. That's why he himself was no longer inside. There were 30 people on the street milling around, leaving. It was clear to the killer where Davis was. That's why he came there. So what was added, I submit? Why was the jury not allowed to consider that he was told by your client where the victim was? I think that it's too slender a read on which to rest the entire murder verdict. While it's true that was his testimony, he did say that my client told him where the victim was. The evidence is clear. He knew where the victim was. That's why he was returning to the scene. And, you know, the added value, he didn't come. The way that he testified, he said, I never would have killed him if Rodriguez didn't tell me where he was. That's what the government had their witness say, if you will. And does that bear scrutiny? He knew where the guy was. He knew he was either inside or outside. If he doesn't see him outside, he knows he's inside. So what was added by my client allegedly telling him that he was right inside? So while, you know, I can conceive of a world where, as Your Honor points out, maybe this should go to a jury, I submit it should not. It's just too simple a fact, if you will. As to the government's Rule 16 violation, defense counsel here for Rodriguez had already opened on the issue that what was said in the hospital records was accurate. My client said that he was at a cookout and shots were fired and a bullet hit him in the hand. So he opened based on that. It was only thereafter that the government produced a cell phone material which showed that my client was actually at the party at the time and that if he's to be believed that he was shot in the hand at the party, he ended up going to a hospital that was completely on the other side of the Bronx. If counsel had had the information on the cell phone data, he never would have opened that way. And the government's going to argue, I maintain, on this Rule 16 issue that the district court found that there was no bad faith on their part. I'm a little, it's true. Judge Coate did say, well, I'm going to allow them to do this because I don't see any bad faith. It wasn't exactly a hearing held. The government produced the evidence at the very last second and claimed we just got hold of this. And the judge said, based on that, you know, I don't see any bad faith. So I don't think that's a hook that they can hang their hat on on that issue. But there was no assertion of bad faith, right? There was no suggestion that there was bad faith at the time, was there? How would he know? I don't, yeah, I think that he gave the government the benefit of the doubt. But how would he know whether or not there was bad faith? I think, I submit, rather, that the inference is clear on the record that once the government heard that counsel opened on the idea that Rodriguez wasn't even at the cookout, he was at somewhere else where he got shot, which is basically what he opened on, that's arguably when the government first started to look into what cell phone data there was to prove exactly where Rodriguez was. But was that cell phone data, or can we tell from the record, was that cell phone data sort of prospective from that point, or was it something they already had and they went back and looked to see if they had cell phone data providing location information? The government claimed that they were under the impression that there was no such data and that it only came to their attention. They had been under the impression, affirmatively, that there was no such data. But after the trial commenced, one way or another, it came to their attention that the data existed. He had already opened and had committed himself to a theory that my client wasn't really even at the shootout, that he got hit at a different shootout. But the cell phone data put him right there in the southeast corner of the Bronx and showed that he went to a hospital in the northwest corner of the Bronx. I see my time's up, so let me just finish the idea, please. And so that the jury would have to believe, therefore, that he got shot in that area and went up to the other area, whereas what the shooter had said was that he got shot at his own home, which was near the northwest corner. Thank you. Thank you, Mr. Feifeld, and you've reserved two minutes for rebuttal. Yes, Your Honor. Mr. Silverman. Thank you. Good morning. May it please the Court, Benjamin Silverman for Corey Brown, who is serving a life sentence on a thin record following a trial in which the fruit of an illegal search and propensity evidence bookended testimony of a cooperator with a history of perjury that he committed a murder at my client's behest. Starting with the illegal search, this is not really a case about was there enough facts for the police to determine that my client was in his apartment before they entered to execute an arrest warrant. They testified that they did not believe he was there, and they dismissed the SWAT team that had been assembled to help with the arrest. They still, nonetheless, entered the apartment without a search warrant in violation of Bohannon and Payton. Can I interrupt you? You're saying they, but I think it makes sense to have some precision, right? The person who made the call was Salter, right? Correct. And Salter explained or testified as to why he made the call that he did, right? Yes. On page 21 of the transcript, he said that his team did not believe that Mr. Brown had returned home, and he said that he had non-particularized experiential ideas that people who go out might return home in the early matters of the morning. He said more than that, right? He said that there was, at that point, other people had been arrested, and so there was reason to believe that he would or might be aware of the fact that the feds were arresting people, right? Right. And he said maybe he went home to say his goodbyes, but that's speculation. And this Court said in Bohannon that a hunch, that speculation is not enough, that it needs to be based off of objective and particularized facts, much like a Terry stop, which they analogized it to the reasonable suspicion standard. It's not enough to say, well, we know people walking around this neighborhood who look like that. That's not enough to stop someone. You have to have a particularized, objective fact from which to have reasonable suspicion or hear reasonable reason to leave, to enter. And that's why the government, as a fallback position, raises for the first time on appeal the idea that there was an untainted consent one to two minutes after the initial entry. This Court has never found attenuation on facts like these, where the record reflects nothing being said to my client's wife between when the police arrived at her door, announced that they had a warrant to enter and search, and please can you move out of the way, and one or two minutes later when they said please can you let us continue searching. There are no intervening circumstances. Did they announce they had a warrant to enter and search, or just they had a warrant for the arrest of your client? Well, they announced they had a warrant and that she had to be cleared out of the way, in their words, so they could enter and they were clearly searching. So at the very least it was implied, but they had a warrant to enter, and they began searching and cleared her out of the way. She's, you know, very pregnant, holding her toddler. They push her out into the hallway. They enter and search. There's a lapse of one to two minutes, the tightest temporal proximity imaginable, and nothing that intervenes to cleanse the taint of the initial entry. And in many ways the voluntariness and the attenuation analysis in this case are similar, because there was nothing, nothing at least in the record, that informed her that contrary to the initial assertion that they had authority to clear her out of the way, push her out of the entrance to her apartment, go in and search, nothing to inform her that now one to two minutes later, while she stays standing in the hall holding her toddler, that now suddenly it was permissible for her to withhold consent. Acquiescence to an apparent show of authority is not optional. The Supreme Court said that in Bumper v. North Carolina. This Court has said that many times. It's involuntary. She was a law enforcement officer herself, right? That's right, and she did what you or I would do, which is when confronted with apparent lawful authority, she acquiesced and let them do what they said they had a warrant to do. You shouldn't speak to what I would do, and I'm not sure what you would do really is relevant either. The issue is whether or not there's a basis to think that she could give a knowing and voluntary consent. I agree, Your Honor. And when someone is told we have a warrant and you need to be cleared out of the way, I don't think anyone thinks that they have the ability to withhold consent or do anything other than comply what's purported to be a lawful order. None of the evidence taken from the apartment tied my client to the murder. All of it was inflammatory, including a bayonet-style rifle that was held up to the jury during rebuttal summation, phones with text messages on the trial transcript from pages 972 to 977, five full pages of transcript during summation. The government read into the record text messages and discussed text messages taken from phones, all of them inflammatory, at A256 to 276 of the appendix. And that was not the only improper evidence. The first two witnesses at the trial provided propensity evidence. Other act evidence of things my client did as a teenager 15 years before the earliest period charged in the indictment that were temporally remote and without any evidence of a continuing pattern of that behavior up to the present, which is what this Court required in Curley for temporally remote other act evidence. This was offered as proof of the enterprise, right? Well, the fact of the enterprise was conceded. I don't think that altered. I mean, the fact that it was conceded doesn't mean that the government doesn't get to introduce evidence about it, right? Well, it certainly addresses the 403 issue, and this Court and Gordon and Scott found that 403 can be violated and reversible when the probative value is so de minimis and the prejudice is so high, and particularly in this case, the first witness testifies that he was in a gang called SMM that has these signs, and then he testifies that Mr. Brown did these things 15 years earlier or 20 years earlier when he was a teenager. That latter testimony does not meaningfully contribute to the evidence of the existence of the enterprise, and it doesn't corroborate him because it's the same witness. And then the second witness at the trial is called to provide testimony about Mr. Brown's arrest for selling drugs when he was a young man. Also, 11 years before the earliest time period charged in the indictment with no evidence in the record presented by the government of a continuing pattern of that behavior in the intervening decade. And to start the trial that way with the first two witnesses providing uncharged acts, temporally remote, unrelated, and one of them, in addition to the testimony about the existence of the enterprise, that can only be to bloody him up in the jury's eyes from the very outset of the trial and to serve an impermissible propensity purposes forbidden by common law and codified in Rule 404B1. Thank you, Mr. Silverman. Hold on a second. Judge Winter, any questions? No. Thank you. You've reserved two minutes for rebuttal, Mr. Silverman. Ms. Graham? Good morning, Your Honors. Margaret Graham for the government. I represented the government below and I represent the government on appeal. The judgments of conviction should be affirmed because there was sufficient evidence on each count for the jury to convict the defendants and the admission of the challenged evidence was not an abuse of discretion. I'll begin with the search of Mr. Brown's apartment unless Your Honors want me to begin elsewhere. The agents here had reason to believe that the defendant may have been home. I think it's important to begin with the ---- Can I interrupt you, Judge? Yes, Your Honor. You seem to suggest that in addition to what you're about to argue that there was also consent to go in for the initial search, right? Yes, Your Honor. She did based on Mrs. Brown's statements to go ahead. But you don't seem to be arguing that. And so what do you say? Are you conceding that that was wrong? Your Honor, we're not conceding it was wrong. We're focusing, however, on the fact that the agents, also independent of that ground, had reason to believe that Mr. Brown may have been home and therefore had reason to execute the search warrant at that time. All right. But you're not arguing it. So you're arguing you think it's valid but you've decided to do this one with one arm tied behind your back and only to rely on the fact that they had reason to believe he was in the apartment. Your Honor, we are focusing on the reason to believe argument. I think the first and most important part is that it was Mr. Brown's home. Many of these cases deal with a concern about agents going into other individuals' homes without reason to believe that the party they're searching for might be there. This was, of course, Mr. Brown's home. But he'd been seen to leave, and they were staked out to make sure they saw when he came back. Nobody saw when he came back. No one saw him come back. And, in fact, they, I think, Mr. Fryfield, no, who was it? Mr. Fryfield. No, Mr. Silverman. Sorry. Mr. Silverman said that they sent the SWAT team home, right? Yes, Your Honor. But on the SWAT team, first of all, the SWAT team and Agent Salter testify they have their own internal policies that they won't wait around all day. Why is this not a hunch, which is not legitimate, not sufficient, as opposed to a reasonable basis to believe that he's home? On that ground, I think it's important to understand the limitations of the surveillance. What they knew was that at about 1.30 a.m., Detective Daugherty, who arrived at the scene around 5 and reviewed video going back starting at about 1 a.m., had seen what he believed was Mr. Brown leaving the area. This is a large complex. It's a co-op city. It's many large residential buildings in one complex. There then was a break where Detective Daugherty had ceased viewing the video, and they then, Agent Salter then directed agents to set up surveillance. So, first of all, there was a break between the viewing when the video stopped and when the surveillance was set up. How long? Do you know how long that was? So the record is unclear, but it's clear that it was at least a period of time. And then it's key to understand the limits of the surveillance that was taking place. As I said, a large complex with multiple entrances. They knew how Mr. Brown had been dressed as he was leaving at 1.30. They knew the vehicle that he had been in, a Cadillac Escalade. They were trying to look for Cadillac Escalades going by and anyone that resembled Mr. Brown. But, of course, the arrest warrants for his co-defendants and co-conspirators who were members of the gang that he was leaving had been executed at 6 a.m. And so they were concerned that he may have been alerted that agents could be looking for him. He only would have had to change clothes or duck down in the car. They testified that they were surveilling the entrances but from a distance. And so there was a very real concern that the surveillance was not foolproof. It's not as though they had, you know, car stops happening and a roadblock set up. And so there was a very real concern. Added to that was Agent Salter's testimony that in his experience with individuals returning home, that if they were going out to party, which the record shows Mr. Brown had done, his wife confirmed that later, and that's what they believed at the time, that the clubs close around 5 or 6, individuals go home. There's also, as Judge Sullivan noted earlier, a concern that Mr. Brown may have learned from the arrest and Salter's testimony that in his experience individuals can go home to say goodbye to their children, to collect their belongings before that happens. There's also, and I think this factors in, as Agent Salter noted, a real downside to going in too early because then, of course, you have alerted Mr. Brown to the fact that you have an arrest warrant and that you're looking for him. He may become a fugitive, which is a public safety concern. And so I think all of that goes to show that the agents did have a reason to believe that the defendant may have been home based on those facts and their experience, which, of course, The latter fact doesn't seem to play much on his being home. I mean, it certainly bears on officer and public safety, but. I offer it more to show why Judge Cote made the factual findings and the credibility findings that she did. Based on that, you know, there's no record of kind of the agents acting in bad faith or kind of creating justifications after the fact. They were engaged in a very real balancing. And, you know, again, we come back to the fact that this was his home. This is not a third party's home that they weren't sure about. And so. Do you want us to consider the issue of consent or not? Yes, Your Honor. I'd like to move now briefly to the issue of consent. The second consent that Judge Cote found. Yes, Your Honor. The second consent. Any putative taint had clearly dissipated here. And going through the snipe factors, no one is contesting that Mrs. Brown did, in fact, give the second content. The only argument is whether any putative taint would have dissipated. As to the Miranda warnings, Mrs. Brown was never in custody, so we submit that that's not relevant. As for the time, other cases have clearly shown that a few minutes is enough to dissipate the taint. And for the intervening circumstances, it's key here to note that the interaction was calm throughout. I think the intervening circumstances and the dissipation are especially important and the cases show are important, where there was an initial forcible entry, where the individual giving consent was handcuffed, as in snipe, where the individual was told that they might have problems with child protective services afterwards. Here, no one was handcuffed. There was no SWAT team. The door was not forcibly breached. It was 9 a.m. Mrs. Brown was awake and had answered the door. There was a do-si-do, though, right? There was no, you know, as — The do-si-do is the first consent, isn't it? Yes, Your Honor. Is that a term of — I mean, I took crim pro. I don't remember that coming up. Yes, Your Honor. Thank you from my colleague from Vermont. Mrs. Barrett helpfully introduced it on cross-examination. It was not my term, but I adopted it. But that's not the first — that's only the first consent. That's not the second consent. That's the first consent, but it goes to show the nature of the interaction to then and the idea that there was not — that there was very little taint, if any, to be dissipated because of the nature of the interaction throughout. The agents by that time, and I think if you read the hearing, it's very clear, despite what defense counsel says in their reply brief, the agents had exited the apartment. They were all out of the apartment, and Mrs. Brown and Agent Salter were having a calm conversation in the hallway. As Your Honors noted, Mrs. Brown was a law enforcement official, which is important to the consideration of whether her will was overborne. And as to the last Snipe factor, the agent's entry was not flagrantly illegal or with equal purpose. They had an arrest warrant for a resident of the home. And so I think looking at all the four Snipe factors and looking at the interaction and the way Snipe says that treating someone with respect can create relative calm sufficient to create a non-coercive environment, we would submit that any taint had dissipated and that Mrs. Brown's will was not overborne and that she did give voluntary and knowing consent. The fact that she was a corrections officer is relevant? Yes, Your Honor, it is relevant to the determination of whether her consent was voluntary and whether her will was overborne. You can look at the sophistication of the individual giving the consent and the extent to which the idea that someone in street clothes with a holstered gun would have created an unduly coercive environment. And I submit with a corrections officer who has her own two service weapons and is a law enforcement officer herself, that's simply not the case. Your Honors, I see I have about six minutes. I don't know which argument you'd like me to address next. I can move on to the evidence of the enterprise, if you wish, or the cell sites. Perhaps address the Rule 16 argument that Mr. Freyfield was raising. With respect, I have, just if you would clarify how it came about that the government essentially had location evidence off the cell phone. Was that developed post-argument, post-opening statement, or was that something that the government had that it missed turning over? It absolutely was developed post-opening statements and in the middle of trial. What happened was on June 13th there were opening statements. That evening the government believed that the cell site records no longer existed because of information that the government had received that the defendant had a track phone. That's the company that services. And the government had information that track phone cell site records are deleted after two years. It had been more than two years at that point since the July 2012 murder, and so the government believed they no longer existed. But all of that inquiry is after the opening, or this took place much earlier when discovery was supposed to be turned over? This took place much earlier, though the government didn't believe it existed. And so AT&T services track phone and the government did have the toll records, which were preserved for a longer period of time. In preparing the AT&T custodial witness to testify at trial, the government inquired, had in its question and answers, the fact that track phone records are only kept for two years. At that point the AT&T custodial witness corrected the government and said, no, they are kept for seven years. And so at that point the government realized in 2017 that the 2012 records, the government realized for the first time that it had been wrong about the existence of the records, that the records existed. This is the evening of the 13th, so after the openings earlier that day, the government immediately alerted defense counsel to the fact that it was getting a cell site order, that there might be new cell site evidence coming. It got the cell site order that evening. The morning of the next day, June 14th, it turned over the raw evidence, so the cell site data itself, and then later that day turned over the draft expert report, which was Investigator Donaldson's slides analyzing the cell site data and showing what the government would argue it would show about defenses. All right. So Judge Coate found no bad faith, and did defense counsel suggest there was bad faith or seek a hearing? No. Defense counsel did not. Defense counsel actually said that there was conceded on the record that there was no evidence that the government had acted in bad faith. And as Your Honor noted, Judge Coate did not find any bad faith. Defense also explicitly stated that they were not asking for a continuance, and Judge Coate gave them until June 19th, so five days later, to have Investigator Donaldson testify about this. He actually had begun testifying on the 15th, but she said we're going to break up his testimony and let him testify about this specific evidence, which you've just received on the 19th, to give you time to prepare on it. I think it's also important to note that the government had noticed defense one month earlier, that Investigator Donaldson was going to be an expert witness about other cell site evidence, the cell site evidence of Mr. Brown and Ms. Bozeman, and so they were no one argued at the time that that notice was inadequate, and so they were on notice at the time that cell site would be at issue in the case, that Investigator Donaldson would be testifying about it and could look into and explore any arguments they wanted to make about the reliability of cell site evidence, as well as potentially seek their own rebuttal witness on that point. As to the opening statement and the argument that they were prejudiced because they introduced this idea on the opening statement, of course, Matthew shows, and we noted in our 28J letter, that there was no substantial prejudice where defense had irretrievably committed itself to the theory before the government received evidence that contradicted the theory, and of course, the record shows that they had given their opening before the government even knew this evidence existed and before the government received this evidence. Could I ask you to switch gears for a minute? Yes, Your Honor. We've got this horse beaten pretty well, at least from that perspective, and of course we'll hear from Mr. Freifield. Would you just marshal, just in very short form, the government's evidence with respect to Mr. Rodriguez's participation in the conspiracy essentially involving a gun to commit a murder? You mean, are you referring to the sufficiency of the evidence on whether Brown was aware that Lopez would use a gun? Yes, sorry, yes. So not Rodriguez. I didn't mean Lopez, I meant Brown. Yes, absolutely, Your Honor. So here you have important background information about sex money murder and how violence within the gang operates, which I think is important to understand. This was Brown, a sex money murder leader, asking a lower-ranking member to kill a rival sex money murder leader, fellow leader of the gang. And so I do think it's important to understand the background of sex money murder, the fact that guns are central to their motto, their nickname, their handshake, their hand signal. The evidence was that any attempted murders or assaults that they do outside of prison where guns are not available, that anything done on the street is done with guns. You have Brown's own glorification of guns, his statements to his probation officer when the probation officer mentioned a shooting in the area, that if it had been sex money, the wall behind the victim would have been riddled with bullets. His back tattoo, which is two guns stretched across his back. The rap lyrics referencing guns. The fact that when Brown wanted to open a new sex money branch in Atlanta, he said that it should be called Gunlanta and that their keyword should be pass me the gun, as well as the testimony about the 1990 shooting of the rival drug dealer where he and other individuals went with guns to shoot at that individual. It's also important to understand Brown and Lopez's specific history, including that Brown had told, instructed Lopez to buy a .40 caliber handgun from sex money murder members from Atlanta in 2013. That Brown had also, prior to the murder, asked Lopez to help him find a gun from Eric Rivera, as well as the two guns found in Brown's apartment, showing that Brown, of course, possessed guns. And then the conversation after the murder, which is that a week after the murder, Brown and Lopez discussed the murder. And Brown, when Lopez stated, I shot him, Brown was happy, according to Lopez, and said, good. He asked if Lopez still had the gun. And when Lopez said yes, Brown said to get rid of it. So we acknowledge that this is circumstantial evidence. I think it's important to note that there's no argument that the jury was improperly charged. The jury was charged as to what was required. And, you know, we submit that a rational trier of fact could have found this beyond a reasonable doubt, and that viewing the evidence in the light most favorable to the government and drawing all inferences in the government's favor, that the evidence was sufficient. Thank you. Thank you. I see my time has expired. Mr. Freyfield. The government is arguing that prior to trial they gave notice to Brown that they were going to use cell site evidence against him, and somehow that satisfies Rodriguez's right to have notice of him. I don't see any connection there at all. Moreover, Ms. Graham's recitation of the circumstances whereby the government first popped this out at the last second, most of that's not in the record. You know, I'm sure that Ms. Graham was, as she acknowledged, she was the trial counsel, so she knew what was going on. Most of the things, again, as I wish to emphasize that, that Ms. Graham stated about the circumstances whereby the government disclosed it late was not in the record. But there was no suggestion of bad faith, right? There was no request for a hearing, in other words. It was the day before summations. You're correct. There was no request for a hearing on whether or not the government was acting in bad faith. The government made representations on the record that this information came to them late, and counsel had no basis to make a request based on that. Pardon me. He had no basis to make an argument that the government was acting in bad faith. They claimed that it came to them late. By the way, there's nothing in the record to rule out that the government wasn't negligent in not knowing. You know, the thing about we were under the impression that it was a track phone versus two years, how did they come by that impression? But we're not really in a position to decide whether they were negligent or acting in bad faith or anything now because the record wasn't made, right? That's why you should reverse. But why hasn't it been waived? I mean, maybe it was ineffective assistance of counsel, but why hasn't it been waived? I think that there's something more material at issue than the government was acting in bad faith. They popped the evidence post. I don't think that bad faith is a dispositive issue. When they pop the evidence post-opening, there has to be some remedy, even if the government is not acting in bad faith. And lastly, I do need a new rule, though, right? I mean, we don't have a rule that says post-opening, evidence discovered post-opening can't be admitted. There isn't such a rule, is there? Well, I think that there isn't such a rule, black and white, like that. I point the court to United States v. Thomas, 239F3163, which is the subject of the government's 28J letter, which I note they filed that letter because I alerted them that I was going to rely on Thomas here, which unfortunately is not in my brief. Briefly, in Thomas, there was no finding of bad faith on the part of the government, but because it was post-opening, the defendant suffered substantial prejudice, and that was the standard rather than whether they were acting in bad faith or not. Yeah, but if you take the logical extension of your argument, that means if you come in, it comes out at trial, there's some new person out there that they don't know about. The government goes out, finds that person, interviews that person, and says, hey, the guy you were talking about, and they give you a heads-up that that person is now being added to the witness list, give you a heads-up, and they say this person is going to stick it to what your witness just said. You can't preclude the government from continuing investigating unless you can tell me a case that says you can do that. Not specifically, but it's the substantial prejudice. By the way, in Thomas, they list the factors that the court should consider in determining. Part of one of them is whether or not the government had bad faith or not, but it's not dispositive at all. And just by the way, to distinguish between the inculpatory witness and this, there's Rule 16, which says that they have to provide it, and it allows the court to sanction the government when they fail to comply with the rule. So that's a little bit different than suddenly uncovering an inculpatory witness at the last moment. Thank you. Thank you, Mr. Frye. Mr. Silverman. I think Judge Sullivan made a critical point when he said the record's not there, and that's what's going on with the suppression hearing. When it comes to a gap, there were no questions about it. When asked how long it is, was it a minute, was it the record's not there, it was not made by the government that had the burden. I'm sorry to interrupt. This is for the second consent that you're talking about? I'm sorry. I was talking about the contention that they were concerned, that the officers had reason to be concerned that maybe they had missed it when they testified that they would have seen him if he had returned because they were watching every door and they believed they would have seen him if he returned. They didn't see him and they did not believe that he had returned. As to the first consent. Let me just interrupt you for a second. But even a two-minute gap would be sufficient for him to get back home, right? But it wasn't established by the government in the record. I mean, it's just not there. Well, there's testimony about a gap, right? I don't think there's testimony. I don't recall. I mean, there's testimony that Detective Doherty arrives between 5 and 5.30 a.m. He views video surveillance seeing Mr. Brown leaving. Then he calls the team and they begin surveillance. So there's an inference that maybe there was a gap. I don't recall him saying that he was concerned about a gap, and that's why he sent home the SWAT team. And, again, you know, we're talking about a record that the government bears the burden of proof as to. And it's the same thing with respect to attenuation. The government says that the officers had left the apartment and that there was an atmosphere of calm. There is no testimony about the officers leaving the apartment. At the top of page 17 and the bottom of page 16 of the hearing record, Agent Salter testified that he was alone with Badria Brown in the hall. She was pregnant holding a toddler. She gave oral consent, and they returned. And he says, then we went back into the apartment. On page 15, line 15, he said he had never been in the apartment yet. So when he says, we went back into the apartment, after he's talking to her alone in the hall, as he said at the bottom of page 16, it appears that what he's saying is that she and the toddler returned to the apartment and he went with them, and that would be consistent with what it appears, although it's not clear, Agent Winfrey says on page 36, about if they had to leave the apartment. In any event, the government bore the burden of attenuation. We argued that the second consent was tainted on page 70. The government all but conceded it on page 64. They had the burden of proving it and did not establish that record, and they're not asking for a Jacobson remand. They're asking for this court to make a finding, based on a record that's not there, to affirm a life sentence for a relatively young man. And I think that that is, frankly, a bridge too far. The government, in any event, even if the agents had left, I just want to be very clear. This court's precedent, in particular Snipe, but also Oggins and Marino, do not say that an atmosphere of calm is an intervening circumstance. Snipe relies on Calp v. Texas for the proposition that you need to have something that breaks the causal chain between the entry, between the illegality and the subsequent consent. And in all three of the analogous cases that this court has decided, the intervening circumstance that broke the causal chain was informing the person that she had a right to refuse consent, reading them a consent to search form. In this case, they say it wasn't read to her until after they start doing the search. Right? Why didn't they read it to her before the consent, like in all these three other cases? And there's no case, no Supreme Court, no opinion of this court, that says that an atmosphere of calm for a one- to two-minute temporal proximity can be an intervening circumstance that breaks the causal chain. And just finally, there was talk about sufficiency, and I want to be very clear. On the 1959A count, the top count, the life count, we're not arguing insufficient evidence. We're arguing that this was a thin case. It was based in very significant part on the testimony of Christopher Lopez that my client said to do this. Mr. Lopez had a history of committing perjury to avoid criminal punishment. He admitted that he lied to the government when he said that my client provided the murder weapon and only told the truth when the person who actually provided the murder weapon was arrested, and he was afraid that that person would co- I'm confused. You're not arguing insufficiency. You're arguing it's a thin case. That's right. Well, because for purposes of the harm analysis, this court and Vayner says that one of the things this court should look at for purposes of determining harm is this. You're saying if we agree with you that the search was invalid. Correct. That because it's a thin case, that would be a basis for reversing. Well, that's right, because in Gordon and in Vayner, this court identified as thin for purposes of a harm analysis a government case that rests in substantial but not entire part on the testimony of a cooperator with significant credibility problems, and that's exactly what we have here. We have a cooperator who admitted to lying when he said that my client provided the murder weapon, who admitted to serially committing perjury to avoid criminal punishment, and the only corroboration was from his wife, who testified on page 730 that she wanted to help him while he was cooperating, and she did not even corroborate the court point that my client wanted or asked for the murder. In fact, that was clearly not her testimony on pages 749 to 750. So you have what can be fairly characterized as a thin, uncorroborated case that the jury was entitled not to believe. This was a short trial, three days of evidence, and the jury took a day and a half to deliberate. I did a murder trial with Mr. Patel last summer. The jury took like an hour, right, when it's an open and shut case. Consider the company. I'm joking. Mr. Patel's expense, he's here. My point is that this is a case when you're waving an assault rifle in front of the jury, holding it up literally during rebuttal summation and telling the jury to think about this gun, not the murder weapon, when for five pages of transcript during the other summation, the government is going over text messages taken from phones of the proceeds of this search, this is what harm looks like. And there's one other, you know, the Vayner court discusses several factors to consider, including the strength of the government's case, the government's use of the evidence, and then, you know, in McCallum and in Curley and in Vayner, a number of cases, this court has pointed to use of improper evidence during summation as critical in terms of a harm finding. I am not aware of, I'm not saying it's not there, I am not aware of a single decision of this court that says that the government emphasis of improper evidence during summation is harmless. But I know of five cases, Vayner, McCallum, Curley, where this court has pointed to use of the evidence in summation as creating harm. And there's also one final point that I think the record in this case sort of signifies that I would like. . . That's the last final point. I'm sorry, the last final point. Thank you, Judge. I appreciate it. Thank you. Thank you, Judge. But, you know, because the rest of my client's life depends on it, I do appreciate the final 30 seconds. Your client is fortunate to have you here, and I mean that sincerely. Thank you for your argument. Thank you, Judge. And the final point is, you know, what made me think of this, you look in the record and you see that my client, when he finds out that there's an arrest warrant, he went down across the street to 500 Pearl Street and he voluntarily and he peaceably surrendered. And I hope that in the future I will have many more clients who do exactly that. I don't think we expect that in countries, you know, around the world where people don't expect fair trials. And this court made a very important point a few days ago in the last two paragraphs of the Manzano opinion, talking about the importance of jury trials and juries obeying the law and following the law. And I'd like to respectfully submit that for criminal defendants to have that kind of confidence that they will peaceably surrender to face capital prosecution, that it is also very important that district courts apply the case law like Bohannon and Payton, even when it leads to undesired outcomes like suppression of evidence, and that when even the most universally, and I mean that, universally respected district courts are, as we all will, that it will be corrected on appeal, at least we're here, as here where the evidence is emphasized in summation, extraordinarily inflammatory, and it cannot be deemed harmless beyond a reasonable doubt. Thank you. Thank you. Happy holidays to all. Thank you. All three of you, much appreciated. The arguments are much appreciated. We will reserve decision in this case.